## AFFIDAVIT OF SPECIAL AMY L. CHANDLER

I, Amy L. Chandler, a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

1. I have been employed as a Special Agent with the FBI since April 11, 2010, and am currently assigned to the Minneapolis Division, Minot Resident Agency. My duties include, among other things, the investigation of violent crimes occurring within Indian Country. While employed by the FBI, I have investigated and participated in investigations involving federal criminal violations related to Innocent Images, child exploitation, human trafficking, sexual assault, and violent crimes.

2. Prior to being employed as a Special Agent with the FBI, I was an Assistant State Attorney for the 9th Judicial Circuit for Orange and Osceola Counties in Florida for more than four years. During that time, I reviewed, charged, and prosecuted criminal cases involving crimes against children, sexually based offenses, violent crimes and drug offenses.

3. As a Federal Agent, I am authorized to investigate violations of laws of the United States, and to execute warrants issued under the authority of the United States.

4. This Affidavit is being made in support of a Compliant and Arrest Warrant for WILLIAM ANTHONY FLY ("FLY"), DOB 11/04/1968, for tampering with a witness, victim, or an informant in violation of 18 U.S.C. § 1512.

5. The statements contained in this affidavit are based in part on: information provided by other agencies; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation; and my experience, training and background as a Special Agent with the FBI. Because this Affidavit is being submitted for the limited purpose of establishing probable

1

cause to believe that FLY committed the above-described offense, I have not included every detail of the investigation. In addition, unless otherwise indicated all statements contained in this Affidavit are summarized in substance and in part.

## FACTS

6. On April 17, 2014, the Ward County crime stoppers received an anonymous call from an anonymous source stating that a minor female victim, Canya Fly, had been raped by her father. The source identified the victim as a 16-year-old female, and her father as TONY FLY (WILLIAM ANTHONY FLY). The reporter stated that the victim had been sexually assaulted by her father between the ages of ten (10) to twelve (12) and that the reporter was told this by the victim two (2) to three (3) months earlier and at that time the victim had asked the reporter not to say anything as the victim just wanted to tell someone so she could move forward with her life. The reporter stated that the victim had told her mother, TIFFANY FLY, and that TIFFANY FLY had confronted WILLIAM FLY, so it had not happened since. The reporter stated she came forward now to tell of what she had been told by the victim as the victim had been removed from school and had been acting strange and depressed since being removed from school. The reporter stated that the last time she saw the victim was at church and that the victim was depressed and withdrawn. The reporter further advised that last night (April 16, 2014) the reporter confronted TIFFANY FLY about the disclosure from the victim and that TIFFANY FLY became upset and stated that it was all lies. The victim's parents were identified as WILLIAM ANTHONY FLY and TIFFANY FLY. Their address was identified as 1301 13th Street NW, Minot, North Dakota. The case was assigned to Ward County Child Protection Worker (CPW) Kristie Urness and Minot Police Detective Cassidy Halseth.

2

7.  CPW Urness went to Market Place Foods (North Hill) and met with the victim. The victim
    was employed by Market Place Foods. The victim reported that she was sixteen (16) years
    old and working full time at Marketplace. The victim stated that she was attending the Adult
    Learning Center in the mornings to obtain her GED. The victim stated that she recently
    moved from Rugby to Minot in August. The victim stated that she lived in fifteen (15) states
    and also lived in Williston, ND. The victim stated that her family vacations in Arizona. The
    victim stated that she has an older brother, who is eighteen (18) years old and a younger
    brother, fourteen (14) years old and younger sister, ten (10) years old. The victim stated that
    her mother is TIFFANY and her father, TONY, works in the oil field. The victim denied any
    type of fighting at home and stated that her family gets along well. The victim stated that if
    she gets into trouble, her phone or the X-Box is taken away. The victim stated that her family
    is Mormon and very active in the church. The victim denied any inappropriate touching by
    anyone and stated that she would talk to her mom or dad if something did happen. At the
    beginning of the interview, the victim stated "I'm not supposed to talk to people." This
    worker observed the victim to be uncomfortable and fidgety when asked about any
    inappropriate touches.

8.  On April 24, 2014, it was decided that CPW Urness would make contact with the other
    children in the Fly home. CPW Urness learned from school officials that the two youngest
    children had multiple unexplained absences and tardiness from school, and that the older
    brother did not attend school.

9.  On April 29, 2014, CPW Urness spoke with Chuck Kranz, principal at Central Campus, the
    younger brother's school. Chuck stated that as of 4/28/14, the younger brother is home
    schooled. Chuck stated that WILLIAM FLY requested that the younger brother be given
    credit for the school year due to the family having to leave the area. WILLIAM FLY gave

3

Principle Kranz different stories about the family being kicked out of the house they were renting in Minot (but they would be receiving $20,000 for the move), that the family was going to a wedding in California, but moving to Utah first, and that the family was living in Rugby and having to drive the family back and forth to school in Minot. Principle Kranz reported that WILLIAM FLY was unwilling to work with the Rugby School District for homeschooling for the middle brother. Principle Kranz stated that the stories varied and changed and that WILLIAM FLY would twist things around. Principle Kranz stated that it sounded like the younger brother "bounced around a lot" in different schools and has also been homeschooled before. Principle Kranz provided CPW Urness with the following phone numbers for the Fly family XXX-XXX-3826 (WILLIAM FLY) and XXX-XXX-1285 (TIFFANY FLY).

10. On April 29, 2014, CPW Urness contacted Market Place Foods. CPW Urness learned that the victim put in her two (2) weeks' notice and stopped coming to work. The victim stated she was moving to Utah.

11. CPW Urness notified Minot Police Detective Halseth about the Fly family moving. On May 1, 2014, the case was determined to be open but inactive by the Minot Police Department.

12. On May 8, 2014, this case was forwarded to Pierce County Child Protection Worker Eileen Lindbo as the Fly family had moved back to Rugby, North Dakota (Pierce County).

13. On May 23, 2014, CPW Lindbo went to the Fly family residence located at 101 1st Street NE, Rugby, North Dakota. CPW Lindbo made contact with the oldest brother who stated he was the only one home. CPW Lindbo requested permission to enter the home, which was denied.

14. On May 23, 2014, CPW Lindbo went to Rugby High School to attempt an interview with the victim. CPW Lindbo learned that the victim was not attending school and was told by the victim's parents that the victim was being home schooled.

4

15. On May 23, 2014, CPW Lindbo placed a phone call to and made contact with the victim about the report made to the Ward County crime stoppers about being raped by her father. The victim denied any sexual contact between herself and her father. During the conversation, WILLIAM FLY took the phone away from the victim and denied having sexual contact with the victim. WILLIAM FLY told CPW Lindbo that the allegation of sexual contact between himself and his daughter, the victim, had been investigated "more than once" and nothing had ever been substantiated. WILLIAM FLY then ended the phone call.

16. On June 2, 2014, CPW Lindbo attempted to make contact with the victim's mother, TIFFANY FLY, by telephone, no one answered the phone.

17. On June 18, 2014, CPW Lindbo attempted a home visit at 101 1st Street NE, the Fly residence, no one answered the door and there were no vehicles around. CPW Lindbo attempted to call the phone number CPW Lindbo had for the Fly family, the phone number was no longer in service.

18. On July 24, 2014, Rugby Police Officer Justin Maus conducted an interview with the victim (16 years old) as a witness to a check forgery in the presence of her father, WILLIAM FLY. While working as a teller at Leever's Supervalue, the victim had accepted a forged check from a customer (suspect) for the suspect's purchase from Leever's. After the interview, as the victim and WILLIAM FLY exited the secured area of the law enforcement center into the lobby, Officer Maus witnessed WILLIAM FLY began rubbing the victim's head in a comforting manner. The victim then put her thumb in her mouth and began sucking it.

19. On October 28, 2014, Ely Elementary Principle Jason Gullickson contacted CPW Lindbo and advised that he had seen the Fly family back in Rugby, North Dakota and he had talked with WILLIAM FLY. WILLIAM FLY informed Principle Gullickson that the Fly family was

moving back to Idaho. Principle Gullickson was provided an updated phone number for TIFFANY FLY as XXX-XXX-1285.

20. On November 24, 2014, CPW Lindbo met with Principle Gullickson, who then informed CPW Lindbo that the Fly family was again in town and that WILLIAM FLY came to Ely Elementary. WILLIAM FLY informed Principle Gullickson that the family was leaving town that day, would be stopping in Williston for a few days, and would then be going back to Idaho.

21. On January 3, 2015, CPW Lindbo drove past 101 1st Street NE, the Fly residence. Eileen Lindbo observed the lights were on and that there was a vehicle in the yard.

22. On January 4, 2015, CPW Lindbo drove past 101 1st Street NE, the lights were off and the vehicle was gone.

23. On January 5, 2015, Ely Elementary Principle Gullickson reported that the victim's sister had been absent from school for a total of thirty-two (32) days and that WILLIAM and TIFFANY FLY had stopped by the school in November and told Principle Gullickson that the Fly family would be leaving for Colorado for a family emergency and would not be returning until after the first of the year. The victim's sister had not been back in school after the new-year. Principle Gullickson reported that on December 2, 2014, the victim's sister had reported to her classroom teacher, Jessica Fritz, that the victim's sister would be leaving, but did not know when. WILLIAM FLY did stop at the school and informed teacher Jessica Fritz that his younger daughter would be in Williston with the Fly family until December 10, 2014, when WILLIAM FLY would be getting stitches taken out in Minot, North Dakota, and then the family would be going to Idaho. Principle Gullickson reported that the same child was gone from school from October 27, 2014 through November 18, 2014. Principle

6

Gullickson reported that based on the numerous absences by the victim's sister, there had been a substantial amount of work missed.

24. On February 9, 2015, CPW Lindbo attempted to make contact with the Fly family using all known phone numbers related to the Fly family. No contact was made, though CPW Lindbo did leave messages for WILLIAM or TIFFANY FLY to contact CPW Lindbo.

25. On February 19, 2015, WILLIAM FLY returned a phone call to CPW Lindbo. WILLIAM FLY advised that he had been in and out of Rugby, not staying long. WILLIAM FLY stated that he was currently in Idaho driving a truck. WILLIAM FLY stated that the victim had signed herself out of school and was doing online classes through the adult learning center, that the victim's phone was broken, and that the victim was no longer working at Leever's Super Value in Rugby. CPW Lindbo advised WILLIAM FLY that there was another report of his younger daughter not being in school. WILLIAM FLY advised CPW Lindbo that he had withdrawn the child from school the last time he was in Rugby and that the child was being home schooled.

26. On February 25, 2015, CPW Lindbo sent a text message to the victim in an attempt to make contact with the victim. CPW Lindbo also sent a text message to WILLIAM FLY to contact CPW Lindbo and advise CPW Lindbo the next time the Fly family would be in Rugby, North Dakota. CPW also messaged the victim on Facebook to contact CPW Lindbo by telephone or Facebook message.

27. On February 26, 2015, CPW Lindbo received a telephone call from WILLIAM FLY. WILLIAM FLY informed CPW Lindbo that the Fly family was now living in Arizona. WILLIAM FLY advised that his younger daughter does homework online for homeschooling and was not registered in school. WILLIAM FLY advised that the victim and the younger brother are also in Arizona. WILLIAM FLY stated that the older brother was at Job Corp in

7

Idaho. WILLIAM FLY advised that his older son had to go to Job Corp because he got assaulted and hospitalized. WILLIAM FLY stated he had back surgery and was still healing. WILLIAM FLY claimed that the family had their own marketing company, was cleaning houses, cleaning offices, doing landscaping, and that WILLIAM FLY was driving a truck.

28. On March 9, 2015, the Child Protection Team information report indicated the following: The victim and WILLIAM FLY both denied that there had been any inappropriate sexual touching or fondling and the victim and WILLIAM FLY both refused to have the victim interviewed at the CAC (Child Advocacy Center). This case was transferred from Ward County. The family had been in Idaho for most of the time that the assessment had been open. Another report was received on 1/5/15, with concerns of educational neglect, the youngest child had not been to school since 12/2/14, and had missed 32 days of school. The assigned case worker had documented many attempts to contact this family, however the family kept moving around, including to Rugby, Williston, Minot, Idaho, and Arizona. Worker has attempted to text message the victim without any response back. WILLIAM FLY called in February and said they had moved to Arizona but he was driving a truck and would not give the worker the town or address of where they were living.

29. On April 26, 2016, Pierce County social services received a report the victim (18 years old) was passionately kissing her sister (12 years old) while in church in Rugby, North Dakota. This was witnessed by parishioners at the church and reported. Approximately one (1) week later Jennifer Wright made contact with WILLIAM FLY and the victim. They had been gone for approximately one (1) week out of state transporting cars. When Pierce County social worker Jennifer Wright attempted an interview with the victim alone, the victim's father, WILLIAM FLY, denied Jennifer Wright access to the victim unless WILLIAM FLY was

present. WILLIAM FLY was allowed in during the interview and the victim denied kissing her sister.

30. On July 8, 2016, TIFFANY FLY brought the victim to the Johnson Clinic in Rugby, North Dakota as the victim was not feeling well. The victim saw nurse practitioner Tammy Harter. Through lab testing it was discovered that the victim was pregnant. Nurse practitioner Tammy Harter then met with the victim alone. The victim disclosed that she had been raped by her father (WILLIAM FLY) and that the baby belonged to her father, WILLIAM FLY. The victim disclosed being molested by WILLIAM FLY since she was nine (9) or ten (10) years old.

31. Melinda Voeller, the Director of Pierce County Social Services, responded to Johnson Clinic. Melinda Voeller obtained an audio recorded statement from the victim. The victim stated the following:

    a.  WILLIAM FLY, her father, is the father of the baby.

    b.  WILLIAM FLY raped her.

    c.  WILLIAM FLY conceived the baby with the victim at the end of April 2016 while transporting vehicles and that it happened in a hotel out of the state of North Dakota while en route to Pennsylvania.

    d.  That WILLIAM FLY began molesting the victim before she was nine (9) or ten (10) years old and that the first time occurred in Idaho.

    e.  Melinda Voeller asked the victim how many times WILLIAM FLY had sexual contact with the victim. The victim responded "too many to count."

    f.  WILLIAM FLY attempted sexual contact with the victim while at a church in Minot, North Dakota approximately three (3) years ago. WILLIAM FLY was kissing her weird.

g.  WILLIAM FLY told the victim "I'll kill you if you don't do it."

h.  When WILLIAM FLY conceived the baby with the victim it started with WILLIAM FLY kissing the victim, WILLIAM FLY making the victim watch pornographic movies, WILLIAM FLY had the victim on the bed and made the victim sit still, WILLIAM FLY had the victim open her legs, at which time the victim stated that WILLIAM FLY "stuck his thing in mine."

i.  WILLIAM FLY put his thing in the victim's vagina and also tried to put his thing in the victim's butt.

j.  The last time WILLIAM FLY had sexual intercourse with the victim was in April 2016 or May 2016.

k.  WILLIAM FLY told the victim that WILLIAM FLY would kill the victim's mother and family if the victim did not do it.

l.  The victim stated sexual intercourse with WILLIAM FLY always occurred out of the town of Rugby, North Dakota.

m.  The victim stated that the sexual intercourse with WILLIAM FLY occurred in at least three (3) states to include Idaho and California and on the trip to Pennsylvania when the victim believes the baby was conceived.

n.  WILLIAM FLY moved his family to Rugby, North Dakota when the victim was ten (10) years old.

o.  The victim stated she had not had sex with anyone else in the last year except her father, WILLIAM FLY.

p.  The victim was afraid to go home as she was afraid that her mother, TIFFANY FLY, would hit her and call her dad about the pregnancy.

q.  The victim was afraid of her dad as her dad would also hit her.

      r.  WILLIAM FLY told the victim that WILLIAM FLY has guardianship over the victim. (This guardianship was denied by the court on November 9, 2015.)

32. Arrangements were made for the victim to stay at a friend's residence in Rugby to protect her from WILLIAM FLY.

33. On July 11, 2016 an appointment was made at Johnson Clinic for the victim to follow-up in reference to her pregnancy to include an ultrasound and lab work. The victim did not make this appointment. Johnson Clinic contacted Melinda Voeller and advised Melinda Voeller of this. Melinda Voeller contacted the victim. The victim stated that she decided to move back home and that her mother, TIFFANY FLY, did not want the victim receiving medical treatment in Rugby, North Dakota. The victim stated that TIFFANY FLY had found a doctor at the Medical Arts Clinic in Minot, North Dakota.

34. During the weekend of July 8, 2016 through July 11, 2016, the victim stayed with Njony Walton in Rugby, North Dakota. Njony Walton reported that the victim also admitted to Njony Walton that the father of the baby was her father's, WILLIAM FLY's.

35. On July 8, 2016 social worker Melinda Voeller met with TIFFANY FLY. TIFFANY FLY provided the following telephone numbers XXX-XXX-1686, XXX-XXX-1285, and XXX-XXX-3826 as being utilized by the Fly family. Phone number XXX-XXX-3826 was a phone number being utilized by WILLIAM FLY. TIFFANY FLY stated that WILLIAM FLY was working in Williston until July 12, 2016 and would then be back home in Rugby. TIFFANY FLY told Melinda Voeller that the family intended to move back to Arizona. Deputy Taylor Schiller directed TIFFANY FLY not to talk to the victim about being sexually assault by WILLIAM FLY and not to tell WILLIAM FLY that the victim disclosed being raped by WILLIAM FLY.

36. On July 8, 2016, the victim allowed Pierce County Deputy Sheriff Taylor Schiller access to the victim's Facebook account to message WILLIAM FLY. WILLIAM FLY had already reached out to the victim stating that TIFFANY FLY told WILLIAM FLY about the pregnancy and wondering what the victim told law enforcement. During the Facebook conversation, WILLIAM FLY repeatedly told the victim to move home. WILLIAM FLY told the victim that he could go to prison for the accusations the victim made. WILLIAM FLY denied being the father of the victim's baby and could prove it as he was out of state. WILLIAM FLY told the victim that the victim was tearing their family apart. WILLIAM FLY told the victim "you are hurting me, your mom, and your brothers.

37. On July 12, 2016 this case was coordinated with the Federal Bureau of Investigation. It was decided that officers would attempt contact with the victim for a welfare check as officers were aware the victim moved home, that WILLIAM FLY was supposed to come home on this day, and that threats had been made towards the victim. When Officers went to the Fly residence where the victim was supposedly staying, no one was there.

38. On July 12, 2016 at 8:30 PM, BCI SA Zachmeier obtained a Search Warrant for Verizon Wireless for cell phone numbers XXX-XXX-1686, XXX-XXX-1285, and XXX-XXX-3826 as being utilized by the Fly family for: current and updated Global positioning/tracking information (GPS) from the time of search warrant service to five (5) days after the search warrant service, GPS coordinates, cell phone tower information in which the cell/mobile phone is utilizing for transmission, cell/mobile phone location information, phone and account user information, cellular phone records from July 7, 2016 through five (5) days [July 17, 2016], incoming calls, outgoing calls, account call logs. The Honorable Judge John C. McClintock, Jr. issued the search warrant.

39. On July 12, 2016 at 9:40 PM, SA Zachmeier received the location information of the cell phones from Verizon wireless. The locations indicated that all three (3) phones were together utilizing the south side of a transmission tower located .28, .34, and .39 miles south of a tower located at 515 33rd Avenue in Minot, North Dakota.

40. On July 12, 2016, at 10:00 PM, Njony Walton coincidently was at the Wal-Mart store in Minot, North Dakota. Njony Walton reported to SA Zachmeier that she witnessed the Fly family together in the beauty section of the Wal-Mart store. Njony Walton stated that WILLIAM FLY was standing next to the victim. (This was after Deputy Schiller directed TIFFANY FLY to keep the victim away from WILLIAM FLY. Wal-Mart was located approximately .3 miles south of the transmission tower.)

41. On July 12, 2016, at 11:10 PM, SA Zachmeier received the updated cell phone locations for the Fly cell phones through Verizon wireless. Phone number XXX-XXX-3826 was utilizing a tower near Stanley, North Dakota. Phone number XXX-XXX-1285 was utilizing a cell phone tower near Rugby, North Dakota. Phone number XXX-XXX-1686 was not transmitting indicating it was either dead or shut off.

42. On July 12, 2016, at 11:30 PM, Rugby Police Officer Scott Bommersbach went to the Fly residence at 101 1st Street NE in Rugby. Officer Bommersbach verified that the victim was okay and now present at the residence. The victim advised Officer Bommersbach that they had just returned from Minot, North Dakota.

43. On July 13, 2016, at 10:00 AM, SA Zachmeier drove by 101 1st Street NE, Rugby, the Fly residence. The vehicle was not there.

44. On July 13, 2016 at 11:00 AM, Deputy Schiller went to the Fly residence and attempt to locate the victim. Deputy Schiller knocked on the door. The victim's younger brother

answered the door and advised that his mother, TIFFANY FLY and the victim went to a doctor's appointment in Devils Lake, North Dakota.

45. On July 13, 2016 at 11:45 AM, SA Zachmeier obtained the updated cell phone location for cell phone number 701-681-1285. Verizon Wireless indicated the cell phone was utilizing a transmission tower near Devils Lake, North Dakota.

46. SA Zachmeier believed that TIFFANY FLY was utilizing a 1998 green Buick Century registered to WILLIAM FLY bearing North Dakota license plate 125AVS. SA Zachmeier contacted Devils Lake Police Detective Sue Schwab to assist with attempting to locate the vehicle TIFFANY FLY was utilizing.

47. On July 13, 2016 at 12:40 PM, Detective Schwab notified SA Zachmeier and advised that she had located the Fly vehicle parked in McDonald's parking lot in Devils Lake, North Dakota.

48. On July 13, 2016 at 12:50 PM, BCI SA Zachmeier and FBI SA Chandler entered McDonald's and identified TIFFANY FLY, the victim, her older brother, and her sister. SA Zachmeier approached TIFFANY FLY and identified himself and requested TIFFANY FLY meet SA Zachmeier in the parking lot as not to cause a scene. TIFFANY FLY agreed.

49. SA Zachmeier and SA Chandler advised TIFFANY FLY that officers wished to meet with TIFFANY FLY and the victim at the Devils Lake Law Enforcement Center, which was located two (2) blocks away. TIFFANY FLY began crying and stated she understood and agreed to meet with officers.

50. On July 13, 2016 at 1:10 PM, SA Zachmeier and SA Chandler met with TIFFANY FLY in a closed office at the Ramsey County Sheriff's Department. The interview was video recorded. TIFFANY FLY admitted to meeting with WILLIAM FLY in Minot, North Dakota on the

evening of July 12, 2016. TIFFANY FLY stated she did this as WILLIAM FLY told TIFFANY FLY to bring the family and meet with WILLIAM FLY.

51. TIFFANY FLY stated that she was aware of the accusation made by the victim about WILLIAM FLY and then began crying. TIFFANY FLY stated that WILLIAM FLY denied sexual contact with the victim. TIFFANY FLY stated that she understood that DNA would prove who the father of the victim's baby was. TIFFANY FLY stated that WILLIAM FLY controls what the family does. TIFFANY FLY stated that she wanted to move her family to Arizona and that WILLIAM FLY wanted to go to Idaho first to get their transport trailer serviced.

52. On July 13, 2016 at 1:50 PM, SA Chandler met with the victim in a closed office. The victim disclosed to SA Chandler that she has been sexually abused since approximately the age of nine (9) by WILLIAM FLY. The victim disclosed WILLIAM FLY routinely "raped" her on trips that took place outside of the state of North Dakota when WILLIAM FLY was alone with the victim. The victim verified that WILLIAM FLY was the father of the baby. The victim believed that conception happened at the end of April 2016 to the beginning of May 2016 at a Best Western hotel in Texarkana, Texas. The victim advised that she had been sexually assaulted by WILLIAM FLY in Idaho and California over the years as well. The victim stated that her father, WILLLIAM FLY, would watch daddy-daughter pornographic movies with the victim on the trips. The victim stated that WILLIAM FLY would take the victim with on the trips while doing vehicle transports. It was during these trips that WILLIAM FLY would sexually assault the victim. The victim stated that WILLIAM FLY would ejaculate inside of her. The victim also described that on some occasions during intercourse, the victim would push away from WILLIAM FLY and go to the bathroom. WILLIAM FLY would then masturbate himself to ejaculation. The victim advised that when

she would get to a hotel, she would try to spend extra time in the bathroom hoping that WILLIAM FLY would fall asleep so she would not be forced to have sexual intercourse with him. WILLIAM FLY would often get hotel rooms with two beds but make the victim sleep nude with FLY in the same bed.

53. The victim indicated that she believed WILLIAM FLY had his teaching degree and that was why WILLIAM FLY removed the children from school and would home school them. The victim further stated that WILLIAM FLY did not want any of his children to graduate from high school as WILLIAM FLY wanted them to get their GED as that was what WILLIAM FLY and TIFFANY FLY did.

54. SA Chandler met with the victim in the presence of TIFFANY FLY. SA Chandler advised TIFFANY FLY that the victim had disclosed sexual abuse from WILLIAM FLY. SA Chandler directed TIFFANY FLY to not allow WILLIAM FLY to have contact with the victim or talk to WILLIAM FLY about the disclosures made by the victim. TIFFANY FLY indicated she understood.

55. On July 13, 2016, Deputy Schiller monitored the victim's Facebook messenger. There were numerous messages sent to the victim by Tony fly. The victim did not respond to these messages. These messages started at approximately 11:16 AM and ended at approximately 11:29 PM.

   a. The message sent at 11:30 AM reads: "We need go out of here and get to where we were going. It will be easier if you just admit to them that you lied. As you did to your sister. That will make them go easier on you. They came to you last night because Naomi turned you in. You won't be welcome at her place any longer. They also looked you over to confirm that you were not there against your will. And that is

16

enough for them to start looking to arrest you and trick you into saying things. We need to go before that happens."

b. The message sent at 12:22 PM reads: "I can't believe Naomi and Cheyenne sending the cops after you. They want you arrested. Those kinds of people are not your real true friends. They would not have done something like that. The stuff she said at Wal-Mart too. She has it in for you. I love you. What did the doctor say? I enjoyed our time together doing stuff like we always do when we are together. It was great to take care of things and help you just like I always have. I am always here for you and have always been. Even when no one else was there for you. I love you and always will."

c. The message sent at 4:08 PM reads: "[The victim's name] don't worry about getting arrested for lying. They will ask if I want to press charges. I think you know that I do not work that way and would never do that. They won't come and get you where we are going to be and I will protect you. You do not need to be upset about Jesse and do things like this to me. Your mother and I wanted to protect you from having these sorts of issues from having sex with a minor which he is. And you did. I was always letting you guys hang out. Then you and he both lie to your mother and I. That could have got us in deep trouble. Crap like this. So please just let them know that you lied about that stuff. I think you and I both know that not only was I not around, but I would never force anyone to do anything especially that and especially to my daughter. I love you with all my heart. That is why you felt safe to just go with me and have me help you take care of your business for you. I have always made you feel safe and protected. That is why I save you from those rapists who abducted you. Even though everyone said you went with them she burned our family. Let her go to the dogs. No I wanted to be there for you. That is why I took you to those therapists to

help you. We will have better ones where we are going. There will be lots of church activities as well. If we get there soon enough we might catch a camp or YSA. Activities or something. I will even let you stop by and say hi to Jesse while we have the trailer serviced. We will get a room drop it off and then take off when they are done. Just like Dallas. It will be good for us all."

d.    The message sent at 8:36 PM reads: "Hi Princess. I love you. I will always love you. We had a good day yesterday as a family again. That is how we need to be again. We need it to stay that way."

e.    The message sent at 8:46 PM reads: "Please my princess admit that you lied. I have not ever force you to do anything and you know that. I cannot even force you to go to school or complete your GED. How would I ever have a chance to force you into those sorts of things?"

f.    The message sent at 11:29 PM reads: "[The victim's name]. I will make a deal with you. I will give you what you want and fix the Jesse thing. You just need to tell the cops that you lied. I promise I will fix it. I will even marry you off to him myself. Just please do not put our family through this. Please fix this for us. I love you my Princess! I only want to protect you and provide for you. The victim what you are doing here is not right to do to our family. You know that I would not ever force you to do anything so that is a lie. You lied to them so just tell them. Then I will talk to Jesse parents and take you there and drop you off. My promise to you. If you really want that this would happen that quick. As soon as tomorrow. I love you and always will. If you love your mom and your sister and your brothers then you will put an end to this and tell them that you lied. This is going or hurt them very badly. Please can you. I will do what I say. I will not even but in all."

18

56. On July 14, 2016, the victim was taken to a medical provider in Minot, North Dakota where another pregnancy test and ultrasound were conducted on the victim. The victim is estimated to be approximately 13 weeks pregnant.

57. As of July 15, 2016 at approximately 9:33 AM Mountain Standard Time, WILLIAM FLY's cell phone was located in Ammon, Idaho.

58. Based on the foregoing, I believe that there is probable cause to believe that FLY committed the following offense, among others: tampering with a witness, victim, or an informant in violation of 18 U.S.C. 1512 from on or about July 8, 2016 through on or about July 14, 2016. Dated this 15th day of July 2016.

AMY L. CHANDLER
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before by telephone me this 15th day of July 2016.

ALICE R. SENECHAL
United States Magistrate Judge